I am Thomas Kennedy. I appear on behalf of Appellant Goodrich. We seek an appeal to have the judgment of the District Court reversed and remanded. We believe that under a plain meaning and interpretation of Section 302... If your client thinks this is a felony, why does he keep agreeing to it and paying the money? You just had a contract expire and you renewed it. Why don't you just say, look, this is contrary to U.S. law. We will not be a party to what we believe to be a crime and therefore we will not agree to this. I mean, it's one thing if you get caught in the middle of a contract and suddenly you have an epiphany. Counsel comes along and says, you know, well, wait a minute, guys, what we're doing is illegal, but we've got this contract and you have arbitration. But you just renewed the whole thing. And are you telling me that your client engaged in felonious conduct knowingly? I'm just a little troubled by this. Your Honor, first, you are absolutely correct that the contract was renewed and a successor labor agreement was entered into. Which you tell me, tell us, is identical, which is why this case is still alive. Yes. And I think as the... Or at least you claim the case is still alive. As the Brian Broderick affidavit, I believe, demonstrates, which was appended to our request for additional briefing on the mootness issue, there was a concern on the part of the company that a labor contract for the entire group, numbering literally hundreds, would have stalled were the company to be insistent on the removal. Following what it believes to be the law? I just can't, I have difficulty taking seriously your claim that this is illegal when your client keeps doing it and doing it and doing it knowingly. Particularly if you claim an illegality which, under your interpretation, is not just a violation of labor laws, but a crime. I just have a hard time... You know, if you really meant it, if you really meant it, if your client really was serious that this is something that, you know, is an affront to labor relations and it weakens the independence of unions and does all those things that you mention in your brief, I'm astounded that your client signed off. You know, if it's illegal, if it's a bribe, if it's extortion, don't do it. And then you go to the labor board, you know, you reach an impasse and you can go to the labor board and they will solve the problem for you. They will, you know, if you believe you're not, you reach an impasse over this clause because of a disagreement on the law, then the lobby will solve the problem for you and you can get a resolution. Why put yourself in a position of agreeing to something and then by claiming this illegality, which just strikes me as not being very sincere on your client's part, then trying to back out of a bargain that you've reached? I think, Your Honor, that the answer is as follows, is that the price that the company would have had to pay were it to be insistent on its rights was deemed by the company to be one that was forbidden. Well, let's say they discovered that it turns out that they were paying the president of the union $10,000 a year under the table. You know, would they keep doing it because the price would be too high? If it's illegal, it's illegal. Don't do it. You know, if you think it's illegal, just don't do it. I have, you know, all those pieties in me about, you know, undermining the independence of unions and all of that. I just have to, you know, it sort of made me laugh. Well, I think, Your Honor, I'll just bring a little bit of personal experience to the fore. It's been my own experience that the idea, of course, to bargain, reach impasse, and to... Do you agree that if you think something is illegal in a contract, you have a duty? If you think it's a felony, you have a duty not to pay the money, and you have a duty not to enter into the contract? Do you disagree with that? No, Your Honor. If you think this is a violation of criminal law? I think with... Is there any doubt that it doesn't matter what impasse you reach or anything else, you have a duty not to do it? I think with the broader... Yes or no? Is your client entitled to commit what he believes to be a violation of the law because he thinks it will suffer grave consequences in the labor area? No. There we go. So if you really believe this to be illegal, you and your client have a responsibility not to do it again. Your Honor, I think what the broader affidavit demonstrated is that he indicated that we will enter into this contract without prejudice to our position and present the case to the court for either... You know, you may think it may not prejudice you, but to me, it just strikes me as a lack of sincerity on your client's part. But go ahead. We've wasted six minutes on this already. But, you know, all this stuff you talk about, I just can't take seriously at all. We can talk about the law, but all this policy stuff? Talking about the law, take us through what went on in the Third Circuit between their overruling... Which got overruled in Caterpillar and then the majority in the dissent in Caterpillar. Because it seems to me that's pretty much the center of gravity on this whole case. Is it not? Yes, it is. And you prefer the Alito dissent or the... Well, that, I think, coupled with the fact that there certainly is very favorable language to my client's position with respect to appellate courts in other jurisdictions. And I believe that those cases were both cited by the dissent and the majority in the Caterpillar case. Well, Caterpillar is a single issue because the guy that was working in the union office, who was the guy here, is on the premises on the Beard Goods, which plant all the time. Yes, in Caterpillar, that person was actually... What happens to Mr. Seifu? Thank you. If while he's wandering around the plant, he slips and falls and breaks his leg, is he entitled to workman's comp? Frankly, I don't think that's ever occurred under California workers' comp. It will. It will. Trust me. How about if he's walking through the plant, and as he's sort of passing one of the female workers, he just decides to pat her fanny and say, nice body or something like that. What's the effect? And the employee complains to the supervisor. The supervisor says, hey, honey, take it. It's okay. You think that Goodrich would be... If that keeps going on and Goodrich does nothing about it, do you think Goodrich might be sued for sexual harassment? I think they may be, because I think under that body of law, the employer needs to be concerned about the conduct not only of the employees, but also of outsiders who are on the property who are engaging that kind of reprehensible conduct. So you think he would be treated as an outsider? He may well be. He may be... What if he's caught stealing? You know, there was a supply room, and he happens to get the key, and he goes in there, and he steals some supplies, and he's caught. Could he be fired by the employer, just like any other employer, or disciplined? I mean, I don't know what happens. Is there a grievance procedure or something? Frankly, my own conjecture would be, yes, he would certainly be subject to being terminated. But I think that the likely upshot would be the union would say... Doesn't that make him different from the guy in Carapel? Because that person is actually on leave. Of course, the leave could be terminated based upon that kind of conduct. I think with respect to the hypothetical that you just gave me, that what would likely occur is the union would say, Mr. Kennedy, the union made the point that this fellow, Sifu, may not be treading a wrench, but he's doing other things that benefit the company. What's your answer to that? I think that my answer, frankly, Your Honor, is found in the BASF Wyandotte case that was authored by Judge Kersey. She indicated a list of duties very much akin to what Mr. Sifu does and declared these are clearly not services to or for the employer, they're for the union. And I believe that... Does it help keep industrial peace to have this grievance system operate with him at the helm? Your Honor, my response to that is, yes, it is a value and a virtue to have a functioning grievance and arbitration process, but it is clearly in no way indispensable to have that person paid by the employer. The more common, frankly, situation in this country is... That's not the question. The question is whether this is useful. The fact that it could be done some other way doesn't really detract from the fact that this is a useful way of performing a function that's valuable to the employer. I mean, do you dispute that? I think then, frankly, relying upon Bechtel, the Bechtel decision that was discussed in the briefing, where the Sixth Circuit said that, to be sure, there probably is some advantage to the employer in this, but the predominant advantage clearly inures to, in this case, a fund, a union fund. Why does the question of who has a predominant advantage matter? Why isn't it enough that the employer is getting a benefit? The union may be getting an equal benefit and may be getting a greater benefit, but what matters is that the employer is getting a benefit. Why isn't that situation where the employee is paid for benefit conferred upon the employer? I think that's a very incidental benefit because, frankly, what occurs... But you agree it's a benefit. It's a very incidental benefit. You agree it is a benefit. It is... I don't know what the word incidental means. Is it minimal? Is it trivial? Is it nonexistent? I would say it is arguments. You don't think the employer benefits by having somebody there to help channel grievances, separate the ones that are worth pursuing from the ones that are not worth pursuing, avoid having everybody standing up for themselves and trying to maybe present grievances that are not worthwhile? You don't think that's an important function under the administration of CBA? The way that the grievance and arbitration procedure finds its way into the contract is the employer gets a no-strike clause, nine times out of ten. So, in other words, this is a price that the employer is paying. The fewer grievances filed from the employer's standpoint clearly is a much more fair welcome because... But the steward makes a decision whether a grievance is to be pursued. If he gets to a dispute on the workplace and he hears the supervisor and he talks to the employee and sort of hears what happened and believes that the employee is in the wrong, he can choose not to pursue a grievance. Yes, that would be within his jurisdiction. That would be a benefit to the employer rather than having the employee say, look, I'm right, I'm right, everybody pursues their own grievance. He occasionally, maybe not as often as you would like, makes a decision that no grievance will be pursued. It could be both benign and it could be malignant. In other words, if the grievance is... Isn't that like every other adjudicator? What do we know about the custom in companies of this size? Obviously shop stewards exist in there, but with the no docking rule, do we assume that typically the shop steward is a part... Spends part of his time with a regular employee function and then the rest of his time doing union work? Or is the experience that you've raised here fairly common now where the shop steward essentially does 100% of his time on union work? I think the case that brings us before this panel is very atypical. I think this is a function of only very, very large employers. Most companies do not pay a steward to work full-time for advancing union interests. The point... So just to complete, I think it's a little difficult, but what you're telling, Judge O'Scannon, is that in most cases you've got people who work part-time and are shop stewards part-time. I just want to understand your answer. In fact... That was full-time, wasn't it? Yes, that would be another large company that did consent to that kind of arrangement. And so what you're saying is in this case, instead of having one steward who spends eight hours a day, they had two guys who worked four hours and spent four hours shop stewards, that would be okay? Yes, and the thinking there is this, is that they are then, of course, they are employed. They are contributing at least 50% of their time to advancing the employer's interests by performing work for the employer. Now, one of the issues in the SIFU arbitration, if I remember correctly, was that the SIFU was entitled to work overtime as machinist. That's correct, Your Honor. And that was determined to be that he was entitled to it. Yes, that was the outcome. And I don't quite know, is that binding on us? Do you dispute that here? I do not dispute that that part of the case was settled. I understand it was settled, but it was settled as a result of arbitration. Yes. And I'm not exactly sure what effect that has on our resolution of the case. You do not dispute? I do not dispute that was the outcome of the arbitration award. I'm sorry. In terms of our understanding of this SIFU or whoever takes this place position, do you dispute that that person can be assigned and can work overtime as a machinist, is entitled to work overtime as a machinist? He can, although I think as the stipulation demonstrated, as of the time this case was filed, he had not. And overtime with this company is on a voluntary basis. But if he volunteers, he's entitled to volunteer. Yes. I couldn't volunteer. You couldn't volunteer. That's correct. Right. So he is in a special class of people who can volunteer and, you know, they will let him go near the machinery. He knows how to operate it, and he's entitled to be paid on overtime for machine work. Correct, although his regular work life is devoted exclusively to advancing union interests. There's no doubt about that. I think that was the stipulation that was actually part of our statement of uncontroverted facts that was approved by the court below. May I reserve some time for one other question? Apart from the argument you make about the violation of the Act, what policy issue or what policy interest of the employer is being served by your approach? In other words, somebody is going to have to do this job, as Judge Kuczynski suggested, maybe two people do four hours a day. Why is that more important from the standpoint of the employer? From the standpoint of the employer, the employer, of course, would clearly prefer to not have an employee who really is not subject to performing the various duties in the plant, but for the overtime example, which the court just discussed, he is basically- He wouldn't just say no. To go back to your earlier point about what may have been their course of conduct during the last round of bargaining that led to the current agreement, they could have just said no. I don't want to repeat myself, but I think the price of that may have been a long period of labor turmoil and labor unrest. All right. OK. David Rosenfeld, on behalf of the union. There's a fact that hasn't brought the court's attention. I think answers 95 percent of these questions. Now, as you pointed out, the subject of the arbitration was Jim Sifu's request that he work as a mechanic on an overtime basis. And Goodhart said, no, we don't want you working, doing, you know, turning the wrench. The arbitrator ruled that in light of the language which existed under that contract by referring to other provisions, that Mr. Sifu, as the steward, was entitled to work overtime and issued an award to that effect. You asked Mr. Kennedy, well, is that binding on the company? When your Honor has asked us to- I actually asked whether it was binding on us. What happened was- I don't quite know what's an arbitration award. We made that argument to the district court, but we haven't advanced it here. But there's another fact that plays into all this, which is that when we submitted a response to the mootness issue, we told you that the language was not materially changed. And that's because, in fact, what actually happened was the language regarding the chief steward did change in negotiations. What the parties did was they added language in the new agreement reflecting what the arbitrator had did, confirming that the steward now has the right to work overtime on weekends and holidays. When you say work overtime, that's doing union work? No, no, working as a mechanic. But as I understand the stipulation, he doesn't do any work as a mechanic. At the time that this case was being litigated, Goodhart said, we will not allow you to turn a wrench. You cannot work as a mechanic. You must spend all your time as the steward. So the stipulation was at that time that was what he was doing. That sounds inconsistent with the argument that the company is making. Well, that was the problem here is that the arbitrator Bickner said that Mr. Sifu is entitled to work overtime as a mechanic. He's entitled to turn a wrench on an overtime basis if he chooses to do that. And so now you've been advised that that arbitration war has been settled, resolved. We argued that it was binding in that sense and that there was a different standard of review in the district court. We haven't pressed that argument here. You're not claiming, I didn't see it in your briefs, any kind of a stop on the part of the company to raise this argument because it's consented to it and consented to it again? I think that's probably foreclosed by the Mullins case that says that if it really is illegal, 302 makes it illegal, there's not a stop from raising it. I think that the court does have the power to declare a provision unlawful under 302 if it turns out to be unlawful. Talk to me a little bit about the mootness issue. The company brings a declaratory judgment under a contract that no longer exists. I'm not 100% convinced that now this other contract, which, as you say, is slightly different in wording, continues the same controversy. Why is a declaratory action that's brought vis-a-vis one contract, why does that continue to be alive vis-a-vis another contract? I suppose it's like the insurance policy we were talking about in the last case, that this is a continuing document. And when the contract is renegotiated, and all collective bargaining agreements are like this, much of it remains the same and some things are changed. The change here isn't really material to the dispute, except it further confirms our position that this is a true no docking kind of a proposition. Well, it's either material or it can't help you. You say it's not material except that it helps us. But if it helps you, it is material. Otherwise, something irrelevant can't be of much use to you. It sounds to me like it maybe does help you because it does clarify you no longer need the arbitration award. You now have a contract that says you can work overtime turning a wrench. Well, yeah, and it does modify it in other respects. For example, the new language, which is in Section 602. It's part of the supplemental material that the company filed. Now it says that he can work overtime. He can only work overtime on weekends and holidays. He can't work overtime during the week and then talks about how it's going to be accounted for and whose responsibility it is. So the parties actually address the issue of negotiations, the negotiations Mr. Barrett described and worked out a solution to the problem, allowing the chief steward to work overtime. And if he or she chooses to do so only on weekends and holidays and not during the week, subject to the other conditions that are contained therein. So they, in fact, adopted the arbitration decision with some slight modification. Do you care if we hold the case moot? Does it matter to you? I suppose it depends on the result of the answer. I prefer the result be dismissed. I would prefer that court make. I prefer a decision on this because Your Honor has asked what is the practice out there? The practice is largely, as Mr. Caine described to you, the history of CIO unions and AFL unions before the merger was that large companies like the steel companies, the automobile companies, the rubber companies that had large plants had these full time committee people, committee men as they called them. And that Congress understood that in 1947. That was the history of the labor relations to have full time people in the plant. They ended up handling grievances. That's not been true in the building. Full time employees of the company paid full time wages. And that was that was common practice in the large companies and the smaller companies. There were part time four hours a day depending on what was needed and what was agreed to. But the automobile companies, the steel companies, the big rubber companies have always chemical companies have usually had these full time people. In fact, the history of this plant reflects that initially the stewards were part time as the company grew. At some point, it was recognized that the steward really had to spend all of his time. So they made him a full time person. And that's the way it's been since then. And as you point out, I mean, of course, made clear that the company thinks they don't need a full time steward. The union doesn't do it. They can cut the hours back in negotiations. And so the practices and I prefer a decision that clarifies, at least in this circuit, because the circus never addressed it, that these no docking kinds of provisions are lawful so that we don't have this issue raised again. And we can go on about our business. So you're telling us the hierarchy of things you want to win. And then you want us to declare it moot. No, I don't. I don't think it's moot. I wouldn't be here because I don't think it's moot, because they're still contending that it's unlawful and fighting about it. And we still are enforcing it. I would say the fact they just agreed to it for another year. Well, I would have preferred they'd abandoned the appeal. I wouldn't the client wouldn't have to spend the money on this case. But to hear so, you know, because I, you know, from represent genius all over the country. We just didn't get to get a good record. The contract is one year. It's a three year contract. You know, we we just don't have this issue clarified. Have put this issue to rest. So we don't face this problem again. And this is what the Sixth Circuit. Well, the trailer didn't do so well there. Well, we. In the third of the six. We've done six. You did five in the third. I think we've done well in the second. The fifth. The third. The Sixth Circuit. I mean, the Phillips or the top case. Which case did the name of the case opposing counsel was referring to. On the back of the next. Well, there we go. Well, that's that's the only distinguishable there. Remember, one of the fundamental questions or a fundamental question. Forcing on local local force. Right. Well, the person was not a employee of Bechtel. He was never. He was a area steward employed, in fact, by the union to handle all the employers paid for by this fund. So he wasn't an employee or arguably even an employee of Bechtel. And so as the other circuits have looked at Bechtel, they said it's distinguishable on that ground. But isn't that just a definitional question? If you want to make the president of the union an employee of the of the employer, you just say he's our employee. And if you want to make the guy who's. You know, as in the third circuit, I forget. I forget these terms. He was he was adjudicator. He had a particular title, but he was working on the union office. And they said, well, that's our employee, too. But he had no. Here it's undisputed that Mr. Sifu is an employee. First of all, the district court found finding he was an employee in the decision. And number two, the court didn't have a trial. It did this on stipulated facts. But in the opening brief, Goodrich concedes that Mr. Sifu is an present employee. What is the president of the union work? Does it mean an employee? You mean someone who wasn't the president of the local? Yeah. Well, the courts have said there's a possibility what a union would do is say all those things. Which is that a union such as the machines would represent employees in the plant and say to the employer, Joe, over here, who's never worked for you, never been the plant. There's nothing about it. Is he elected president? We want you to take him as our steward. Now, if Joe never set foot in the plant and never did anything or set foot there once a month. One could argue that this that he isn't being paid for reason of his service as employed member that the circuits of all use because of the reason of his employment. So Joe never had set foot in the plant, had worked someplace else, was the elected president of the union and union forces the employer to accept him as a steward. I see a problem. But remember, this is the reverse. But he's doing things that quite arguably help the employer if he is keeping peace. You know, people, people want to grieve and he's telling them, no, we're not going to take up your grievance about the strike. And he says, no, no more strike. You know, we will take care of it. You may be doing lots of stuff that employers are happy with. Well, let's assume that you take Joe and you put him in the plant full time. Employers is OK. We'll hire him. We'll make him a full time employee. He'll be in the plant. We'll do exactly what Mr. Seifu does. Then I don't think we have the problem as long as he's in there doing what the chiefs are supposed to do on a full time basis because it was collectively bargained. One could see a circumstance, as Mr. Kennedy suggested, where in response to your question, if Mr. Seifu did something inappropriate. We concede the employer has a right to treat him like any other employee and discipline him. Let's assume the employee discipline Mr. Seifu and fired him for something inappropriate. We don't have a vacancy. Now, under this contract, we can't appoint somebody from the outside. The membership gets to elect it. So we don't have that problem here. But let's assume the contract to elect somebody from among the ranks. That's right. They can't elect. Yeah, it says a union president. Right. Has to be an existing employee. Now, it's not clear. It says there should be one chief shop steward assigned to the plant who should be elected by the membership of the I.M. Employee at War Inc. I think that's fairly well read and that it would have to be someone that the membership elects in their life. You elect somebody from within the ranks, but it isn't. It's not limited. No, but that that's been the practice here. And I think that's the way this would work. But I've got trouble with the no docking rule as such. I think it makes a lot of sense. But the suggestion of the rule is that there's an allocation of time. So that if you're spending a certain part of your time on union related activities, you can't be docked for that. But isn't the innuendo that if it's zero to one hundred, the no docking rule doesn't apply at all. Well, then the question is, if it's ninety nine percent. Right. I think that's what all the courts have said. It makes no sense to say as long as a person is full is doing business. And part of that business involves representing employees in the plant, handling safety matters and things that benefit everybody. That whether you've got two people doing four hours a day or one person eight hours a day makes no difference. And that's that's why I began my argument pointing out that now the way the contract works is Mr. Sifu is in part a chief steward 40 hours a week and in part has the right to work as a mechanic on an overtime basis. So the allocation worked here is 40 hours your chief steward and some additional hours. You work overtime as a little bit more about the overtime. Let's say Mr. Sifu puts in for overtime. Does the employer have to give him overtime? Yes. Under the under the arbitrator's award. Yes. And under the current language. Yes. In the new agreement. New agreement. It's plain that the chief shop steward will be placed on his or her department overtime roster and will be eligible to participate. So now it's mandatory. I'm sorry. Just so I make sure I understand because it says eligible is is the is it the way it works is once you get on the roster, your name sort of moves up. Right. The employer can't say, you know, we like Joe over here because he's a better mechanic. And so we're going to give him most of the overtime and we're not going to give Bob over here the overtime because, you know, we don't like, you know, for whatever reason. Exactly. It is not like that. It is exactly. There's a system so that those who want to work overtime get an equal amount. There's a balancing system, it says, you know, sort of Mr. Sifu puts his name on the list and consistent with the with the CBA, whether it's weekends and holidays and not evenings. If his name reaches the top of the list. He gets it automatically. I'm not sure where the top of the list or there's a wheel, the various ways of allocating the contract says, but it's a mechanical process that does not involve employer discretion. Right. So if he if he puts his name on the list, he can be pretty sure of getting it. Yes. And he gets it in conjunction with the other worker. So he isn't preferred. It simply says in order to maintain, he gets it. He gets it just like everybody on the same basis. Somebody else. Right. In the same position. Right. Kind of a real system. Not that, you know, in the sense that they just allocate it and keep everybody at the same level. So if you want overtime, you get no more than somebody else. And you kind of balance it out. This is in order to maintain the appropriate overtime balance. If his or her name comes up in the overtime rotation during the week, he or she will be charged as if she'd been asked to work the overtime. That's during the week. So on the weekend, Mr. Sifu would get the overtime. So the parties actually then, I think, in conclusion, created a no docking system and further put it in the contract by saying that the chief steward would be eligible to work. But I don't think this case has to hinge totally on that fact, because what's relevant is the company agreed. Mr. Sifu is employed. He's subject to the same rules of the employee. And an employer often wants this system. I think it's a response to your question about the value here, because it's a lot preferable, I think, for Goodrich and most employers to have someone, the chief steward who's been in the plant for a long period of time. They understand the history. They understand the culture. They understand the people. They don't bring outsider issues and interests into it. And they're also subject to going back and working and turning a wrench when their period of stewardship ends. So they have sort of more of a of a cooperative interest, often not always in resolving safety issues, grievance issues, maintaining the accurate records, dealing with all these issues. So a company like Goodrich has a strong interest in having this because it serves their interest. And as this contract reflects, the steward is elected from the membership. So the membership gets to choose someone to be the steward. And this system is work. Congress understood it in 1947, been a part of the industrial system for since the National Relations Act was in effect. And we submit this thing that this system should not be disturbed under these circumstances. Thank you. Thank you. Your Honor, I will, of course, be glad to entertain any further questions, but I have nothing else to say. This overtime thing seems to be quite unhelpful to you. Now that you've agreed to it. I mean, this sounds to me like this guy really is an employee. He's entitled to get work in the shop. He gets to put his hand on a bench. Of course, I think the overtime is is very sporadic and very and very intermittent. But you agree that the overtime when performed is for the benefit of the employer. Yes. Yes. So why isn't this sort of like a big docking, no docking clause? Because I think his his regular 40 hour shift is the question is, is he an employee? And maybe, you know, you have a pretty good deal going there saying, well, you know, look at what Judge Manson said. Look at what Judge Areto said. You know, you could have the president of the union have the whole union leadership on the employee's payroll, employee's payroll. And, you know, those are sort of difficult problems of line drawing. But doesn't seem to apply to your guy because your guy actually gets to put his hands on the wrench. He he is entitled to go in there and be a mechanic. And he's that's part of the benefits. That's part of his relationship with the employer. And I don't see how you can distinguish that from a whatever he does. Seven hours, regular work and one hour, seven hours for the union and one hour, one hour working with a wrench or eight hours in an overtime. I just don't see the distinction. The great preponderance of this time is clearly devoted to the interest of the union, filing grievances and the like against Goodrich. That's all I would say to that, Your Honor. I just might agree that Hughes is a weaker case in Caterpillar in that way. In in that sense, yes, there wasn't any overtime implication at all in the Caterpillar. The employee in Caterpillar didn't even work in the in the plant and there was no opportunity, no right to get hands on, you know, wrench work. Right. Or whatever they did in Caterpillar. That is a distinction between the case before. It's a distinction that cuts against you. Insofar as that case goes against you. This is an unfortunate case. I think here it's the preponderance of the time in Caterpillar was all the time. OK. OK. Thank you. Cases are you will say submitted. We will take a five minute recess. All right. . . . . . . . .  . . .
judges: Kozinski, O'scannlain, Silverman